ORDERED.

Dated:  September 29, 2021

Michael G. Williamson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                          Case No. 8:19-bk-07720-MGW
                                                Chapter 11
Friends of Citrus and the
Nature Coast, Inc.,

         Debtor.
_____/

### FINDINGS OF FACT AND CONCLUSIONS OF LAW
### ON DEBTOR'S CLAIM OBJECTION AND TURNOVER MOTION

When the Debtor sold its hospice operations to Vitas Healthcare Corporation,

it represented and warranted that it was in compliance with all relevant state and

federal laws and regulations. Those regulations required the Debtor to (among other

things) have in place emergency preparedness plans that provide for, in case of an

emergency, an alternate source of energy to maintain safe temperatures in resident-

occupied areas.

Vitas claims the Debtor's representation and warranty is false because the

existing 80kW generator at the Debtor's in-patient hospice facility—the sole source

of back-up power—was not big enough to run the facility's HVAC system if the power went out. So Vitas has filed a proof of claim in this case seeking indemnification for the cost of a new 350kW generator. Because the Debtor was not required to have a generator to comply with state or federal laws, Vitas is not entitled to indemnification, and the Debtor's objection to Vitas' proof of claim should be sustained and its motion for return of funds escrowed to secure the Debtor's indemnification obligations should be granted.

## I.    Findings of Fact

Four years ago, twelve residents at The Rehabilitation Center at Hollywood Hills died in the aftermath of Hurricane Irma when the skilled nursing facility's air conditioning system failed during a power outage.[1] To keep a similar tragedy from occurring again, the State of Florida promulgated rules effectively requiring all nursing homes and assisted living facilities to have generators to maintain cool temperatures during a power outage.[2]

### A.    The Debtor operated an in-patient hospice facility.

The Debtor is a charitable not-for-profit organization that was created nearly forty years ago to provide residents of Citrus County options for receiving end-of-life

---

[1] Trial Tr. Vol. I, Doc. No. 397, p. 63, l. 22 – p. 64, l. 6; p. 95, ll. 9 – 12; Trial Tr. Vol. IV, Doc. No. 387, p. 88, l. 17 – p. 89, l. 15.

[2] Trial Tr. Vol. I, Doc. No. 397, p. 52, l. 24 – p. 53, l. 12; p. 95, ll. 13 – 25; Trial Tr. Vol. IV, Doc. No. 387, p. 88, l. 17 – p. 89, l. 15. To be more precise, as discussed in greater detail below, the administrative rules require assisted living facilities and nursing homes to have a sufficient alternate power source *such as a generator* to maintain safe indoor air temperatures (not to exceed eighty-one degrees Fahrenheit) in resident-occupied areas.

hospice care.[3] For the first two decades or so, the Debtor's hospice care was exclusively home-based.[4] Eventually, though, the Debtor realized it needed to have its own facility where it could provide symptom control and pain management to patients who could not have their symptoms or pain managed at home.[5] So, in 2005, the Debtor constructed a 10,078-square-foot, sixteen-bed in-patient hospice facility in Lecanto, Florida, known as Hospice House.[6]

### B.  In-patient hospice facilities are different than assisted living facilities and nursing homes.

Individuals live at assisted living facilities and nursing homes.[7] An assisted living facility or nursing home, in effect, becomes the individual's primary residence.[8] An in-patient hospice facility, by contrast, is typically used for short-term symptom management.[9]

Unlike assisted living facility or nursing home residents, patients do not live at in-patient hospice facilities. With some exceptions, Medicare and Medicaid limit in-

---

[3] Trial Tr. Vol. IV, Doc. No. 387, p. 12, l. 10 – p. 13, l. 19. Later, the Debtor expanded its services to cover a twelve-county region. Trial Tr. Vol. IV, Doc. No. 387, p. 12, ll. 14 – 19.

[4] Trial Tr. Vol. IV, Doc. No. 387, p. 12, l. 20 – p. 13, l. 10.

[5] Trial Tr. Vol. IV, Doc. No. 387, p. 13, l. 20 – p. 14, l. 11.

[6] Trial Tr. Vol. I, Doc. No. 397, p. 125, ll. 5 – 14; p. 126, ll. 6 – 15; Debtor's Ex. 87, Doc. No. 336-5.

[7] Trial Tr. Vol. III, Doc. No. 386, p. 103, l. 20 – p. 104, l. 9; Trial Tr. Vol. IV, Doc. No. 387, p. 96, ll. 10 – 24.

[8] Trial Tr. Vol. III, Doc. No. 386, p. 103, l. 20 – p. 104, l. 9; Trial Tr. Vol. IV, Doc. No. 387, p. 96, ll. 10 – 24.

[9] Trial Tr. Vol. III, Doc. No. 386, p. 103, l. 20 – p. 104, l. 9; Trial Tr. Vol. IV, Doc. No. 387, p. 93, l. 8 – p. 94, l. 17.

patient hospice stays (or at least payment for them) to five days.[10] The average length of stay at Hospice House was 5.3 days.[11]

### C.    In-patient hospice facilities are required to have an emergency preparedness plan that provides for an alternate source of energy to maintain safe temperatures.

The Florida administrative rule governing hospices requires hospices to maintain a comprehensive emergency management plan that ensures hospice patients are prepared for potential or imminent emergencies and disasters.[12] The federal regulation governing the conditions for participation in Medicare requires hospices to implement emergency preparedness policies and procedures that address (among other things) alternate sources of energy to maintain temperatures to protect patient health and safety.[13]

### D.    Hospice House had a generator that provided back-up power to the facility.

When Hospice House was built in 2005, the project included an 80kW natural gas generator.[14] The generator sat on a concrete pad in a fenced in area on the

---

[10] Trial Tr. Vol. IV, Doc. No. 387, p. 95, l. 21 – p. 96, l. 9.

[11] Trial Tr. Vol. III, Doc. No. 386, p. 11, l. 23 – p. 12, l. 9; p. 61, ll. 18 – 21.

[12] § 400.610(1)(b), Fla. Stat. (requiring hospices to "'[p]repare and maintain a comprehensive emergency management plan that provides for continuing hospice services in the event of an emergency that is consistent with local special needs plans'"); Fla. Admin. Code R. 59A-38.018 (requiring hospices to "'prepare and maintain a comprehensive emergency management plan'" that describes "'[p]rocedures to ensure preparation of hospice patients for potential or imminent emergencies and disasters'").

[13] 42 C.F.R. § 418.113(b)(6)(iii)(B)(1).

[14] Trial Tr. Vol. IV, Doc. No. 387, p. 30, l. 25 – p. 31, l. 4; Debtor's Ex. 87, Doc. No. 336-5, § 2.4.

Debtor's property.[15] It provided back-up power for emergency lighting, as well as food refrigeration and anything related to food service.[16] It also electrified the "red receptacles" in patient rooms,[17] which meant the generator was capable of running electricity to the sixteen patient rooms.[18] If there was a power outage, the generator would start up automatically.[19]

### E.    Although the Debtor had a generator, its plan to maintain safe temperatures in case of an emergency was to relocate its patients.

The generator was not hooked up to Hospice House's heating, ventilation, and air conditioning (HVAC) system because it was too small.[20] With the building load (anything that consumes electricity) already connected to the generator, adding the HVAC system would be too much for the generator to handle.[21] If the HVAC system were added, a circuit breaker on the generator would more than likely open, shutting down power to the facility.[22]

---

[15] Debtor's Ex. 87, Doc. No. 336-5, at § 2.4, p. 3; Trial Tr. Vol. II, Doc. No. 385, p. 166, ll. 18 – 23.

[16] Trial Tr. Vol. IV, Doc. No. 387, p. 42, ll. 2 – 12.

[17] Trial Tr. Vol. I, Doc. No. 397, p. 139, ll. 6 – 13; Trial Tr. Vol. II, Doc. No. 385, p. 50, ll. 2 – 8. "'Red receptacles'" are electrical outlets that are typically connected to a generator and "'live on generator power.'" Trial Tr. Vol. I, Doc. No. 397, p. 37, l. 25 – p. 38, l. 2; p. 54, ll. 9 – 18.

[18] Trial Tr. Vol. IV, Doc. No. 387, p. 42, ll. 2 – 12.

[19] Trial Tr. Vol. I, Doc. No. 397, p. 40, ll. 17 – 19; p. 139, ll. 11 – 13.

[20] Trial Tr. Vol. I, Doc. No. 397, p. 32, l. 18 – p. 33, l. 8; p. 36, l. 23 – p. 37, l. 1; p. 129, ll. 3 – 24.

[21] Trial Tr. Vol. I, Doc. No. 397, p. 33, l. 24 – p. 34, l. 12; p. 35, ll. 6 – 18; p. 48, l. 16 – p. 49, l. 11.

[22] Trial Tr. Vol. I, Doc. No. 397, p. 35, ll. 6 – 18.

Even though it was not connected to Hospice House's HVAC system, the generator did provide some ability to maintain safe temperatures at Hospice House. The generator could power four 5,000-BTU window air conditioning units that could be plugged into the "red receptacles" to help cool four patient rooms if the power went out.[23] And, while the generator was not hooked up to Hospice House's HVAC system, it was hooked up to the blower system inside Hospice House,[24] which meant the blower system could move air (including air cooled by the window air conditioning units) through the building.[25] Even so, the Debtor was not relying on the generator as its "alternate source of energy" for maintaining safe temperatures in the facility.[26]

---

[23] Trial Tr. Vol. I, Doc. No. 397, p. 126, l. 21 – p. 128, l. 7; p. 132, l. 19 – p. 134, l. 7; p. 145, ll. 1 – 17. The Debtor bought fourteen or sixteen window units in July 2016. Trial Tr. Vol. I, Doc. No. 397, p. 126, l. 21 – p. 128, l. 7. At the time, the Debtor was having trouble with its air conditioning unit and needed to replace a fan motor. Trial Tr. Vol. II, Doc. No. 385, p. 159, ll. 7 – 12. Even though the fan motor replacement was only supposed to take a couple hours, Bonnie Saylor, the Debtor's CEO, was concerned that the air conditioning unit could be down for more than a couple of hours in the middle of summer in Florida. Trial Tr. Vol. II, Doc. No. 385, p. 159, l. 7 – p. 160, l. 2. So Ms. Saylor decided to buy the window units and have them installed. Trial Tr. Vol. II, Doc. No. 385, p. 159, l. 7 – p. 160, l. 2. After the fan motor was replaced, the Debtor left the window units in for a few months before Saylor decided to have them removed and put them in storage because they looked unsightly. Trial Tr. Vol. II, Doc. No. 385, p. 159, l. 7 – p. 160, l. 2. Eventually, all but three or four units were sold at a thrift store the Debtor operated. Trial Tr. Vol. II, Doc. No. 385, p. 160, ll. 7 – 21.

[24] Trial Tr. Vol. I, Doc. No. 397, p. 129, l. 14 – p. 130, l. 14; p. 146, ll. 8 – p. 147, l. 11.

[25] Trial Tr. Vol. I, Doc. No. 397, p. 147, ll. 4 – 7.

[26] Trial Tr. Vol. I, Doc. No. 397, p. 167, l. 25 – p. 168, l. 3; Trial Tr. Vol. III, Doc. No. 386, p. 9, ll. 2 – 25.

Instead, in case of an emergency, such as a hurricane, the Debtor's plan was to relocate its patients.[27] The Debtor had a contract with every skilled nursing facility in Citrus County, including one that was just a mile up the road, as well as with Citrus Memorial Hospital, which had a hospice facility and "scatter beds" throughout the hospital.[28] The Debtor also had contracts with several transportation companies that were certified to transport medical patients.[29] This plan was memorialized in the Debtor's Comprehensive Emergency Management Plan.[30]

### F.    The Debtor's emergency plan was never cited by AHCA.

Each year, Florida's Agency for Healthcare Administration ("AHCA"), which administers Medicaid in Florida and licenses and regulates Florida healthcare facilities, inspected Hospice House.[31] Hospice House passed all its annual site and safety inspections.[32] AHCA never cited the Debtor for its window air conditioning

---

[27] Trial Tr. Vol. I, Doc. No. 397, p. 167, l. 25 – p. 168, l. 3; Trial Tr. Vol. III, Doc. No. 386, p. 9, ll. 2 – 25.

[28] Trial Tr. Vol. II, Doc. No. 385, p. 167, l. 25 – p. 170, l. 4; Trial Tr. Vol. III, Doc. No. 386, p. 12, l. 22 – p. 13, l. 13.

[29] Trial Tr. Vol. II, Doc. No. 385, p. 170, ll. 5 – 19.

[30] Debtor's Ex. 32, Doc. No. 325-7.

[31] Trial Tr. Vol. I, Doc. No. 397, p. 142, ll. 5 – 9.

[32] Trial Tr. Vol. I, Doc. No. 397, p. 142, ll. 5 – 9; Trial Tr. Vol. IV, Doc. No. 387, p. 43, ll. 2 – 9.

units,[33] nor was the Debtor ever cited for the method or sufficiency of its alternative source of energy.[34]

### G.    The Debtor's emergency plan worked.

In 2016, Hurricane Hermine threatened the west coast of Florida.[35] So the Debtor started evaluating patients to make sure they had an alternate location for care if evacuation was necessary.[36] In anticipation of Hurricane Hermine, the Debtor relocated its patients (and staff) to a long-term care facility on the other side of Citrus County—far away from the coastline—and to one of its own units located in a hospital.[37]

The following year, Hospice House was threatened by Hurricane Irma—the same storm that led to the tragic death of a dozen residents at Hollywood Hills.[38] With roughly a week's warning, the Debtor worked with its patients to find out what their plans were.[39] Most went home to their families, while some patients were relocated to a skilled care facility.[40] But the Debtor took on four patients from its

---

[33] Trial Tr. Vol. I, Doc. No. 397, p. 142, ll. 5 – 9.

[34] Trial Tr. Vol. I, Doc. No. 397, p. 142, ll. 5 – 9.

[35] Trial Tr. Vol. IV, Doc. No. 387, p. 43, ll. 10 – 13.

[36] Trial Tr. Vol. IV, Doc. No. 387, p. 43, ll. 10 – 20.

[37] Trial Tr. Vol. IV, Doc. No. 387, p. 43, l. 17 – p. 44, l. 15.

[38] Trial Tr. Vol. IV, Doc. No. 387, p. 45, ll. 14 – 15.

[39] Trial Tr. Vol. IV, Doc. No. 387, p. 45, l. 14 – p. 46, l. 5.

[40] Trial Tr. Vol. IV, Doc. No. 387, p. 45, l. 14 – p. 46, l. 5.

home-based care who were forced to evacuate from their homes and agreed to stay at Hospice House.[41]

The Debtor placed the four patients in rooms with wall air conditioning units.[42] Over the weekend, the power went out.[43] When it did, the 80kW generator automatically turned on and powered the wall air conditioning units, which were plugged into the red receptacles.[44] The Debtor used the blower system on the HVAC system, as well as a few floor fans, to circulate the cool air from the wall air conditioning units throughout the building.[45]

After the storm passed, AHCA inspected Hospice House to see how it operated without power during the storm.[46] AHCA officials asked to interview any patients, families, volunteers, or staff who were at Hospice House during the power outage to see how the Debtor handled the emergency.[47] In all, AHCA spoke with two patients, two families, and several staff members and volunteers.[48] As AHCA left the inspection, after speaking with patients, families, volunteers, and staff, it

---

[41] Trial Tr. Vol. IV, Doc. No. 387, p. 45, l. 14 – p. 46, l. 5.

[42] Trial Tr. Vol. IV, Doc. No. 387, p. 45, l. 14 – p. 46, l. 5.

[43] Trial Tr. Vol. IV, Doc. No. 387, p. 46, ll. 6 – 16.

[44] Trial Tr. Vol. IV, Doc. No. 387, p. 46, ll. 6 – 16.

[45] Trial Tr. Vol. IV, Doc. No. 387, p. 46, ll. 6 – 16.

[46] Trial Tr. Vol. IV, Doc. No. 387, p. 46, l. 22 – p. 47, l. 3.

[47] Trial Tr. Vol. IV, Doc. No. 387, p. 47, ll. 4 – 10.

[48] Trial Tr. Vol. IV, Doc. No. 387, p. 47, ll. 4 – 10.

indicated to Bonnie Saylor, the Debtor's CEO, that they were pleased with Hospice House's performance.[49]

### H.   The Debtor decides to sell its hospice operations.

In January 2016, the Debtor decided to sell its hospice operations.[50] The Debtor spoke with nine potential hospice operators before ultimately settling on Vitas Healthcare Corporation, which had hospice operations in thirty-two counties, as the potential buyer.[51] In January 2017, the Debtor and Vitas entered into a confidentiality and non-disclosure agreement for sale of the Debtor's hospice operations.[52]

By May 2018, Vitas had begun its due diligence.[53] During the due diligence period, the Debtor gave Vitas full access to its operations.[54] Vitas, including its Chief Compliance Officer, was on site at the facility; it received a tour of Hospice House by Ms. Saylor; and it requested, received, and reviewed documents from the Debtor,

---

[49] Trial Tr. Vol. IV, Doc. No. 387, p. 47, l. 22 – p. 48, l. 1.

[50] Trial Tr. Vol. IV, Doc. No. 387, p. 17, l. 22 – p. 21, l. 10.

[51] Trial Tr. Vol. IV, Doc. No. 387, p. 25, l. 11 – p. 27, l. 17; Trial Tr. Vol. III, Doc. No. 386, p. 89, ll. 17 – 19; Debtor's Ex. 133, Doc. No. 330-1.

[52] Trial Tr. Vol. IV, Doc. No. 387, p. 25, l. 11 – p. 27, l. 5.

[53] Debtor's Ex. 119, Doc. No. 339-8; Trial Tr. Vol. IV, Doc. No. 387, p. 29, ll. 4 – 12.

[54] Trial Tr. Vol. IV, Doc. No. 387, p. 29, ll. 4 – 12.

including maintenance records for the generator and site surveys from AHCA visits.[55] Vitas continued its due diligence through September 2018.[56]

**I.     The Debtor contracts to sell its hospice operations (including Hospice House) to Vitas.**

In July 2018, Vitas retained Stephen Ecencia, an attorney board certified in state and federal administrative practice, to negotiate an asset purchase agreement with the Debtor for the acquisition of Hospice House.[57] Mr. Ecencia, coincidentally (or maybe not), previously represented AHCA in licensure proceedings against the Rehabilitation Center at Hollywood Hills.[58] A month into the negotiations, Mr. Ecencia began working on an escrow agreement as part of the asset purchase agreement.[59]

On September 5, 2018, the Debtor entered into an Asset Purchase Agreement for the sale of its hospice operations to Vitas for $11 million.[60] The assets sold under the Asset Purchase Agreement included the Hospice House in-patient facility.[61] The

---

[55] Trial Tr Vol. III, Doc. No. 386, p. 79, l. 16 – p. 85, l. 11; Trial Tr. Vol. IV, Doc. No. 387, p. 32, l. 3 – p. 33, l. 4.

[56] Trial Tr. Vol. IV, Doc. No. 387, p. 30, ll. 19 – 24.

[57] Trial Tr. Vol. I, Doc. No. 397, p. 62, l. 21 – p. 64, l. 10; p. 66, l. 17 – p. 67, l. 20.

[58] Trial Tr. Vol. I, Doc. No. 397, p. 63, l. 22 – p. 64, l. 6.

[59] Trial Tr. Vol. I, Doc. No. 397, p. 69, ll. 2 – 13.

[60] Debtor's Ex. 1, Doc. No. 320-1, §§ 2.1 & 2.4.

[61] Debtor's Ex. 1, Doc. No. 320-1, § 2.1.1, Schedule 2.1.1.

Asset Purchase Agreement was accompanied by a Real Estate Purchase Agreement, which set forth the terms of the sale of Hospice House.[62]

**J.    The Debtor represents and warrants its hospice operations comply with state and federal law.**

As part of the Asset Purchase Agreement, the Debtor made various representations and warranties.[63] Among other things, the Debtor represented and warranted that (1) its real property was structurally sound, free of material defects, and in good operating condition and repair;[64] (2) the real property was adequate for the use to which it was being put;[65] (3) the real property would be sufficient for continued use after the sale closed;[66] (4) the Debtor was not in violation of any governmental approvals, licenses, or permits;[67] and (5) the Debtor was not in violation of any federal, state, or local law, regulation, license, or permit governing the Hospice House.[68]

---

[62] Debtor's Ex. 2, Doc. No. 320-2.

[63] Debtor's Ex. 1, Doc. No. 320-1, Art. 3.

[64] Debtor's Ex. 1, Doc. No. 320-1, § 3.5.2.

[65] Debtor's Ex. 1, Doc. No. 320-1, § 3.5.2.

[66] Debtor's Ex. 1, Doc. No. 320-1, § 3.5.2.

[67] Debtor's Ex. 1, Doc. No. 320-1, § 3.11.4(b).

[68] Debtor's Ex. 1, Doc. No. 320-1, § 3.11.1. Section 3.11.1 of the Asset Purchase Agreement specifically provides that the Debtor "is in compliance with each Legal Requirement that is applicable to it or to the conduct or operation of its business or the ownership or use of any of its Assets." *Id.* "Legal Requirement," a defined term under the Asset Purchase Agreement, means "any federal, state, local, municipal, foreign, international, multinational, or other administrative order, constitution, law, ordinance, court order, consent decree, regulation, license, permit, statute, or treaty." *Id.* at Art. 1.

If the Debtor breached any of those representations and warranties, it agreed to indemnify Vitas for any losses or damages arising from the breach of the representations and warranties.[69] To secure its indemnification obligations, the Debtor agreed to escrow $1.3 million of the purchase price.[70]

Section 12.5 of the Asset Purchase Agreement created a process for making claims against the escrowed funds.[71] Under section 12.5, Vitas was required to notify the Debtor in writing if it had suffered any damages resulting from a breach of the representations and warranties.[72] If the Debtor timely objected, then the escrow agent would be required to hold the disputed amount in escrow until the claim was resolved.[73]

**K.    Before the sale closed, Vitas raised an issue with the generator.**

About a week before closing, an issue came up regarding Hospice House's generator.[74] Louis Tamburro, Vitas' Vice President of Development, was concerned that Hospice House's 80kW generator did not satisfy the regulations promulgated in

---

[69] Debtor's Ex. 1, Doc. No. 320-1, § 12.2.1.

[70] Debtor's Ex. 1, Doc. No. 320-1, § 12.5.1.

[71] Debtor's Ex. 1, Doc. No. 320-1, § 12.5.1.

[72] Debtor's Ex. 1, Doc. No. 320-1, § 12.5.1.

[73] Debtor's Ex. 1, Doc. No. 320-1, § 12.5.1.

[74] Trial Tr. Vol. III, Doc. No. 386, p. 108, l. 25 – p. 111, l. 11; Trial Tr. Vol. IV, Doc. No. 387, p. 56, ll. 2 – 4.

the aftermath of the Hollywood Hills incident.[75] Mr. Tamburro believed those regulations applied not only to assisted living facilities and nursing homes, but hospices, too.[76] So Mr. Tamburro asked Ms. Saylor if the 80kW generator could run Hospice House's HVAC system.[77]

Ms. Saylor didn't know.[78] So she asked Chuck Magnani, Hospice House's maintenance manager.[79] When Mr. Magnani said the generator did not run the HVAC system, Ms. Saylor asked Mr. Magnani to have an engineer come out and figure out what needed to be done so that the generator could run the HVAC system.[80] Florida Detroit Diesel-Allison, a generator vendor, inspected the generator and determined that adding the HVAC system to the generator would overload the generator.[81]

Detroit Diesel recommended having an electrical engineer evaluate Hospice House's electrical system to determine the size of generator that would be needed to power the HVAC system (and the remaining building load).[82] Ms. Saylor forwarded

---

[75] Trial Tr. Vol. III, Doc. No. 386, p. 108, l. 25 – p. 111, l. 11; Debtor's Ex. 51, Doc. No. 326-1.

[76] Trial Tr. Vol. III, Doc. No. 386, p. 108, l. 25 – p. 111, l. 11.

[77] Trial Tr. Vol. II, Doc. No. 385, p. 176, l. 25 – p. 177, l. 17.

[78] Trial Tr. Vol. II, Doc. No. 385, p. 176, l. 21 – p. 177, l. 17.

[79] Trial Tr. Vol. II, Doc. No. 385, p. 176, l. 21 – p. 177, l. 17; Trial Tr. Vol. I, Doc. No. 397, p. 128, ll. 10 – 16.

[80] Trial Tr. Vol. II, Doc. No. 385, p. 176, l. 21 – p. 177, l. 17.

[81] Trial Tr. Vol. I, Doc. No. 397, p. 30, l. 24 – p. 35, l. 13; Vitas' Ex. 11, Doc. No. 332-1.

[82] Vitas' Ex. 11, Doc. No. 332-1.

Detroit Diesel's generator evaluation to Vitas and called for an electrical engineer.[83] Michael Dobbs, Vice President of Engineering at APG Electric, determined that a new generator was needed to run the HVAC system.[84] APG Electric estimated a $550,000 budget for turnkey installation of a new 350kW generator, which the Debtor forwarded to Vitas two days before closing.[85]

The same day he received APG Electric's budget, Mr. Tamburro e-mailed Ailsa Davies, Vitas' Director of Real Estate, as well Vitas' counsel, and asked whether the Debtor would have been required to upgrade its generator "[g]iven the recent changes in generator requirements"—a reference to the regulations adopted in the aftermath of Hollywood Hills.[86] Vitas' counsel advised the company that he had not located any Florida-specific generator requirements for hospices like the ones adopted for assisted living facilities and nursing homes.[87]

### L.    For a year after the sale closed, Vitas operated with the 80kW generator as its sole source of back-up power.

Even though the generator issue had not been resolved, the sale closed on September 26, 2018.[88] The next day, Vitas' Internal Management Consultant advised

---

[83] Vitas Ex. 14, Doc. No. 347-1.

[84] Trial Tr. Vol. I, Doc. No. 397, p. 45, l. 10 – p. 48, l. 19.

[85] Debtor's Ex. 121, Doc. No. 341-1.

[86] Trial Tr. Vol. II, Doc. No. 385, p. 71, ll. 6 – 9.

[87] Debtor's Ex. 50, Doc. No. 325-13.

[88] Trial Tr. Vol. IV, Doc. No. 387, p. 56, ll. 2 – 4.

Mr. Tamburro and Ms. Davies (among others) that the generator requirement adopted in the aftermath of Hollywood Hills applied only to assisted living facilities and nursing homes—not free-standing hospices.[89] Even so, in January 2019, Vitas decided to replace the existing 80kW generator because it did not power the HVAC system.[90]

Originally, the new generator was going to be 200kW.[91] But it was increased to 350kW because Vitas also decided to add a redundant air conditioning system to each patient room and the common areas, and Vitas wanted the new generator to power the redundant air conditioning system, as well as the existing HVAC system.[92] The new 350kW generator was installed on June 5, 2020.[93]

Seven months earlier, a temporary generator had been brought to the facility to supplement the existing 80kW generator.[94] But from the closing of the sale of the Debtor's hospice operations in September 2018 until September 2019, the sole source of back-up power at Hospice House was the existing 80kW generator.[95]

---

[89] Debtor's Ex. 52, Doc. No. 326-2; Trial Tr. Vol. III, Doc. No. 386, p. 112, l. 24 – p. 113, l. 14.

[90] Trial Tr. Vol. II, Doc. No. 385, p. 42, ll. 2 – 8; p. 73, l. 7 – p. 74, l. 4.

[91] Trial Tr. Vol. II, Doc. No. 385, p. 48, l. 24 – p. 49, l. 6.

[92] Trial Tr. Vol. II, Doc. No. 385, p. 48, l. 1 – p. 49, l. 6.

[93] Trial Tr. Vol. II, Doc. No. 385, p. 122, ll. 17 – 22.

[94] Trial Tr. Vol. II, Doc. No. 385, p. 124, ll. 4 – 7.

[95] Trial Tr. Vol. I, Doc. No. 397, p. 142, ll. 23 – 25; Trial Tr. Vol. II, Doc. No. 385, p. 122, l. 17 – p. 127, l. 6; Trial Tr. Vol. III, Doc. No. 386, p. 122, ll. 9 – 13.

### M. Vitas makes a claim against the escrowed funds for the cost of the new 350kW generator.

On July 22, 2019, ten months after the sale closed, Vitas notified the Debtor that it was making a $297,006 claim against the $1.3 million escrowed under the Asset Purchase Agreement.[96] According to Vitas, the Debtor informed Vitas before closing "that the [in-patient hospice] facility was not in compliance with a federal law requirement regarding 'alternate sources of energy.'"[97] Although the Debtor estimated the cost of a new generator was $550,000, Vitas obtained a bid for $262,492, plus $34,514 in architectural and engineering costs, though Vitas later increased its indemnification claim to $404,296.93.[98] The Debtor objected.[99]

### N. The Debtor objects to Vitas' proof of claim in this bankruptcy case.

On August 16, 2019, the Debtor filed for chapter 11 bankruptcy.[100] In this bankruptcy case, Vitas filed a $510,884.42 proof of claim for the cost of the new

---

[96] Debtor's Ex. 64, Doc. No. 326-8.

[97] Debtor's Ex. 64, Doc. No. 326-8.

[98] Debtor's Ex. 64, Doc. No. 326-8.

[99] Debtor's Ex. 73, Doc. No. 326-12. A year later, Vitas served another Escrow Claim Notice. Vitas' Ex. 9, Doc. No. 331-4. In the follow-up Escrow Claim Notice, Vitas raised its indemnification demand to $404,296.93 and articulated, in more detail, the basis for its alleged indemnification claim: the Debtor allegedly breached its representations and warranties under the Asset Purchase Agreement, including its representation and warranty that it was in compliance with all state and federal laws and regulations. *Id.*

[100] Doc. No. 1.

350kW generator.[101] The Debtor objected to Vitas' proof of claim and demanded turnover of the $1.3 million being held in escrow.[102] The Court must now determine whether Vitas is entitled to be reimbursed for the cost of the new generator from the escrowed funds.

## II.    Conclusions of Law

Whether Vitas is entitled to reimbursement for the new generator turns on one issue: Did the Debtor breach its representation and warranty in the Asset Purchase Agreement that it was in compliance with all federal, state, and local laws, regulations, and ordinances governing its hospice operations?[103] Vitas contends that at the time the Asset Purchase Agreement closed, the Debtor was in violation of 42 C.F.R. § 418.113(b)(6)(iii)(B) and Florida Administrative Rule 59A-38.018.[104]

Vitas' argument goes like this: the Florida administrative rule governing hospice providers—Rule 59A-38.018—required the Debtor to implement an emergency plan that "ensure[d] preparation of hospice patients for potential or

---

[101] Claim No. 12-2, pt. 2. Vitas originally filed a claim for $1,055,270.03. Claim No. 12-1. Of that amount, $405,270.33 was for the 350kW generator. Vitas claimed it had a contingent claim for the remaining $650,000. Claim No. 12-1, pt. 2. It's unclear what the basis of that contingent claim was.

[102] Doc. No. 316.

[103] The Debtor has argued that Vitas' indemnification claim is barred by an "as-is" provision in the Real Estate Purchase Agreement. Debtor's Proposed Findings of Fact and Conclusions of Law at 13 – 17. That argument turns on whether the generator is a fixture and whether the Real Estate Purchase Agreement is an independent document. *Id.* The Court need not address those issues because it concludes that the Debtor did not breach its representations and warranties.

[104] Vitas Healthcare Corp.'s Proposed Findings of Fact and Conclusions of Law at 10 – 17.

imminent emergencies and disasters."[105] The federal regulation governing Medicare

hospice providers—42 C.F.R. § 418.113—required the Debtor to have an "alternate

source of energy" to maintain safe temperatures in case of an emergency.[106]

According to Vitas, "there is no other source of providing temperature control in the

event of a power outage other than a generator,"[107] which is what Vitas claims the

Debtor relied on for its alternate source of energy.[108] Because the Debtor's existing

80kW generator could not run the HVAC system,[109] Vitas reasons that the Debtor

was not in compliance with federal or state law.

The Court disagrees. To begin with, neither state law nor federal law required

the Debtor to have a generator to maintain safe temperatures. And while the Debtor

did have a generator, the Debtor was not, as Vitas claims, relying on its generator to

maintain safe temperatures. Rather, the evidence at trial was that the Debtor's plan

all along was to evacuate its residents in case of emergency. Not only was that a

viable plan, one that was never cited by AHCA, but the evidence at trial showed that

Vitas relied on that same emergency plan (with the 80kW generator its sole source of

back-up power) for a year after closing on the sale of Hospice House. In short, the

---

[105] Fla. Admin. Code R. 59A-38.018(5) – (6).

[106] 42 C.F.R. § 418.113(b)(6)(iii)(B)(1).

[107] Vitas Healthcare Corp.'s Proposed Findings of Fact and Conclusions of Law at 14.

[108] Vitas Healthcare Corp.'s Proposed Findings of Fact and Conclusions of Law at 11.

[109] Vitas Healthcare Corp.'s Proposed Findings of Fact and Conclusions of Law at 10 – 11.

evidence at trial was overwhelming that the Debtor was in compliance with all federal and state laws, regulations, and ordinances governing Hospice House.

### A. Neither state law nor federal law required the Debtor to have a generator sufficient to maintain safe temperatures.

Let's start with state law. Section 400.610, Florida Statutes, requires hospices to "[p]repare and maintain a comprehensive emergency management plan that provides for continuing hospice services in the event of an emergency."[110] Rule 59A-38.018, which implements section 400.610, Florida Statutes, requires hospices to prepare and implement a plan that provides for "[p]rocedures to ensure preparation of hospice patients for potential or imminent emergencies and disasters."[111] By its plain terms, Florida administrative Rule 59A-38.018 says nothing about a generator.

But two other administrative rules do. In the wake of the Hollywood Hills tragedy, AHCA promulgated two administrative rules—one governing assisted living facilities and the other governing nursing homes—that require assisted living facilities and nursing homes to prepare an emergency plan that "address[es] emergency power in the event of the loss of primary electrical power."[112]

The rule governing nursing homes, which mirrors the rule for assisted living facilities, functionally mandates a generator:

> (1)    DETAILED NURSING HOME EMERGENCY POWER PLAN. Each nursing home shall prepare a

---

[110] § 400.610(1)(b)(1), Fla. Stat.

[111] Fla. Admin. Code R. 59A-38.018(5) – (6).

[112] Fla. Admin. Code R. 58A-5.036; 59A-4.1265.

detailed plan ("plan"), to serve as a supplement to its Comprehensive Emergency Management Plan, to address emergency in the event of the loss of primary electrical power in that nursing home, which includes the following information:

(a)    *The acquisition of a sufficient alternate power source such as a generator(s), maintained at the nursing home, to ensure that current licensees of nursing homes will be equipped to ensure the protection of resident health, safety, welfare, and comfort for a minimum of ninety-six (96) hours in the event of the loss of primary electrical power.* Safe indoor air temperatures in resident occupied areas shall be determined by the licensee to meet the clinical needs of residents, but shall not exceed eighty-one (81) degrees Fahrenheit.[113]

Under the administrative rules promulgated in the aftermath of Hollywood Hills, assisted living facilities and nursing homes must have a sufficient alternate source of power—*such as a generator*—to maintain safe temperatures for its residents (not to exceed eighty-one degrees Fahrenheit) for ninety-six hours.

Although it knew how to impose a "generator mandate," AHCA chose not to impose one for hospices. Even after Hollywood Hills, AHCA did not mandate that hospices have a sufficient alternate source of power such as a generator to maintain safe temperatures (not to exceed eighty-one degrees Fahrenheit) for ninety-six hours. In other words, Florida law did not mandate that the Debtor have a generator to maintain safe temperatures at the Hospice House.

---

[113] Fla. Admin. Code R. 59A-4.1265(1)(a)(1) – (2) (emphasis added). The rule for assisted living facilities is essentially verbatim to the one for nursing homes. Fla. Admin. Code R. 58A-5.036.

It is true, as Vitas points out, that section 467.2.8.1 of the Florida Building Code requires hospices to have a Level II, type 10, Class 48 generator:

> A Type III essential electrical system shall be provided in all hospice facilities as described in *National Fire Protection Association Life Safety Code 99*, "Health Care Facilities", and incorporated by reference in Rule 69A-3.012, *Florida Administrative Code*. The emergency power for this system shall meet the requirements of a Level II, type 10, Class 48 generator as described in *National Fire Protection Association Life Safety Code 110*, "Emergency Standby Power Systems", and incorporated by reference in Rule 69A-3.012, *Florida Administrative Code*.[114]

Whereas a Level I generator is the type of generator you would see in a hospital, where a loss of power would be an immediate threat to the life or safety of, say, patients in surgery, a "Level II" generator is less critical to the life and safety of a patient.[115] The references to "Type 10" and "Class 48" have to do with the maximum number of seconds it takes for the generator to kick on (ten seconds) and the number of hours of fuel to be on hand before refueling is necessary (forty-eight hours). But nothing in the building code requires the generator to be sufficient to maintain safe temperatures.[116]

What about federal law? Although the text of 42 C.F.R. § 418.113 is cumbersome, its requirements are relatively straightforward: Under 42 C.F.R. §

---

[114] Debtor's Ex. 134, Doc. No. 358-1; Trial Tr. Vol. IV, Doc. No. 387, p. 107, l. 18 – p. 108, l. 19.

[115] Trial Tr. Vol. IV, Doc. No. 387, p. 107, l. 18 – p. 108, l. 19.

[116] In any event, the Debtor's expert witness testified that, in his opinion, the Debtor's 80kW generator met the building code. Trial Tr. Vol. IV, Doc. No. 387, p. 109, ll. 8 – 22.

418.113, hospices are required to "develop and implement emergency preparedness policies and procedures" that "address . . . the provision of subsistence needs for hospice employees and patients, whether they evacuate or shelter in place," including "alternate sources of energy to maintain . . . [t]emperatures to protect patient health and safety."[117] Does that mean hospices are required to use a generator to maintain safe temperatures?

In its guidelines interpreting 42 C.F.R. § 418.113, the Center for Medicare and Medicaid Services ("CMS"), the federal agency charged with administering Medicare, explained that "[i]t is up to each individual facility, based on its risk assessment, to determine the most appropriate alternate energy sources to maintain temperatures."[118] As part of their risk assessment, all Medicare providers, including hospices, should "consider[] the particular type of hazards most likely to occur in their areas."[119] Relying on that language, as well as other language in CMS's interpretive guidelines, Vitas argues that CMS intended for hospices to have "broader and more stringent requirements" than hospitals when it comes to maintaining alternate sources of energy.[120]

---

[117] 42 C.F.R. § 418.113(b)(6)(iii)(B)(1).

[118] Vitas' Ex. 74 at 22.

[119] Medicare & Medicaid Programs; Emergency Preparedness Requirements for Medicare and Medicaid Participating Providers and Suppliers, 81 Fed. Reg. 63860, 63861 (Apr. 28, 2020) (to be codified at 42 C.F.R. pts. 403, 416, 418, 441, 460, 482, 483, 484, 485, 486, 491, and 494).

[120] Vitas Healthcare Corp.'s Proposed Findings of Fact and Conclusions of Law at 12.

For instance, in its final rule, CMS explained that, because of the terminally ill status of hospice patients, the rules governing hospitals are appropriate for hospice providers:

> Given the terminally ill status of hospice patients, we continue to believe that in an emergency situation they may be as or more vulnerable than their hospital counterparts. This could be due to the inherent severity of the hospice patient's illness or to the probability that the hospice patient's caregiver may not have the level of professional expertise, supplies, or equipment of the hospital-based clinician. We continue to believe that the hospital emergency requirement, with some reorganization and revision as proposed, is appropriate for all hospice providers. In addition, we note that existing hospice regulations at § 418.110(c)(1) already require inpatient hospice facilities to have a written disaster preparedness plan. Therefore, we do not agree that an exemption for inpatient or outpatient hospice facilities is appropriate.[121]

The rules governing hospitals require hospitals to have generators.

But, in quoting extensively from CMS's interpretive guidelines and final rule, Vitas leaves out the parts where CMS explains that § 418.113 does not require a hospice to have a generator as its "alternate source of energy." In its interpretive guidelines, for example, CMS expressly states that for a hospice to meet the "alternate energy source" requirement, it need not have a generator:

> Alternate sources of energy depend on the resources available to a facility, such as battery-operated lights, or heating and cooling, in order to meet the needs of a facility during an emergency. Facilities are not required to

---

[121] Medicare & Medicaid Programs; Emergency Preparedness Requirements for Medicare and Medicaid Participating Providers and Suppliers, 81 Fed. Reg. 63860, 63901 (Apr. 28, 2020) (to be codified at 42 C.F.R. pts. 403, 416, 418, 441, 460, 482, 483, 484, 485, 486, 491, and 494).

> upgrade their electrical systems, but after review of their
> risk assessment, facilities may find it prudent to make any
> necessary adjustments to ensure that occupants health and
> safety needs are met, and that facilities maintain safe and
> sanitary storage areas for provisions.
>
> *This specific standard does not require facilities to have or install
> generators or any other specific type of energy source. . . .*[122]

In its final rule, CMS explicitly rejects the argument that, because some of the

rules governing hospitals are appropriate for hospices, a hospice is required to have a

generator:

> We proposed that the requirements for an emergency
> generator and onsite fuel source to power the emergency
> generator would apply only to hospitals, CAHs [Critical
> Access Hospitals] and LTC [Long Term Care] facilities.
> We did not include other providers/suppliers discussed in
> the proposed rule.[123]

Given CMS's explicit comments, both in its interpretive guidelines and its final rule,

§ 418.113 plainly does not require a hospice to have a generator as its alternate

source of energy for maintaining safe temperatures.

## B.     The Debtor had a policy for an alternate source of energy to maintain safe temperatures in case of an emergency.

Although § 418.113 does not require the Debtor to have a generator, the

Debtor still must have an alternate source of energy to maintain safe temperatures.

---

[122] Vitas' Ex. 74 at 22 (emphasis added).

[123] Medicare & Medicaid Programs; Emergency Preparedness Requirements for Medicare and Medicaid Participating Providers and Suppliers, 81 Fed. Reg. 63860, 63896 (Apr. 28, 2020) (to be codified at 42 C.F.R. pts. 403, 416, 418, 441, 460, 482, 483, 484, 485, 486, 491, and 494) (emphasis added).

According to Vitas, the "Debtor's elected alternate energy source was a generator."[124] Because the generator could not run Hospice House's HVAC system, Vitas contends "[i]t is uncontroverted that the Debtor did not have . . . an alternative source of energy" in violation of 42 C.F.R. § 418.113.[125]

Not so. The generator was never the Debtor's plan for maintaining safe temperatures in case of an emergency. Ms. Saylor testified consistently that the Debtor's plan was to evacuate its patients.[126] The plan to evacuate patients was memorialized in its 2018 Comprehensive Emergency Management Plan,[127] which the Debtor provided to Vitas before the sale closed.[128]

As set forth in its Comprehensive Emergency Management Plan, the Debtor had "contracts with facilities for patient services," and those "same agreements are used during an emergency situation, including disasters."[129] In fact, Ms. Saylor testified that the Debtor had a contract with every skilled nursing facility in the county, including one that was just a mile up the road, as well as with Citrus Memorial Hospital, which had a hospice facility and "scatter beds" throughout the

---

[124] Vitas Healthcare Corp.'s Proposed Findings of Fact and Conclusions of Law at 11.

[125] Vitas Healthcare Corp.'s Proposed Findings of Fact and Conclusions of Law at 11.

[126] Trial Tr. Vol. I, Doc. No. 397, p. 167, l. 25 – p. 168, l. 3; Trial Tr. Vol. III, Doc. No. 386, p. 9, ll. 2 – 25.

[127] Debtor's Ex. 32, Doc. No. 325-7.

[128] Trial Tr. Vol. IV, Doc. No. 387, p. 54, ll. 1 – 3.

[129] Debtor's Ex. 32, Doc. No. 325-7, at 9.

hospital.[130] Ms. Saylor also testified that the Debtor had contracts with several transportation companies that were certified to transport medical patients.[131] Although the Debtor's plan was to evacuate patients, it's worth noting the Debtor did have four wall air conditioning units that were hooked up to the "red receptacles," which were electrified by the generator,[132] and the blower system, which was also hooked up to the generator, could blow air cooled by the window air conditioning units throughout the facility.[133]

Vitas, however, argues that a plan to evacuate is, in essence, no plan at all because "[a]s anyone who lives in Florida knows, evacuation is not always practical in the event of a storm."[134] Vitas goes on to point out all the potential problems with trying to evacuate during a storm—problems Vitas claims the Debtor ignores: roads flood; power lines come down; and patient beds fill up, especially in this day and age of COVID-19. Vitas' argument that an evacuation plan is no plan at all is not persuasive for several reasons.

For starters, the Debtor did not ignore the potential problems with evacuating patients. Ms. Saylor testified that Lecanto, Florida, where Hospice House is located,

---

[130] Trial Tr. Vol. II, Doc. No. 385, p. 167, l. 25 – p. 170, l. 4; Trial Tr. Vol. III, Doc. No. 386, p. 12, l. 22 – p. 13, l. 13.

[131] Trial Tr. Vol. II, Doc. No. 385, p. 170, ll. 5 – 19.

[132] Trial Tr. Vol. I, Doc. No. 397, p. 126, l. 21 – p. 128, l. 7; p. 132, l. 19 – p. 134, l. 7.

[133] Trial Tr. Vol. I, Doc. No. 397, p. 129, l. 14 – p. 130, l. 14; p. 146, ll. 8 – p. 147, l. 11.

[134] Vitas Healthcare Corp.'s Proposed Findings of Fact and Conclusions of Law at 14.

sits in the center of Citrus County, where flooding is not an issue because the area is "pretty high."[135] To be sure, power lines do come down during hurricanes. But the Debtor wouldn't be relocating patients during the hurricane. As Ms. Saylor pointed out during her testimony, the Debtor would know the possible hurricane path five (and sometimes ten) days in advance.[136] So the Debtor would begin making preparations and start relocating patients before the hurricane even got close.[137] And given that Hospice House's census was relatively low (on average, five patients on any given day), and it had contracts with every skilled nursing facility in the county, as well as with Citrus Memorial Hospital, the availability of hospital beds does not appear to have been an impediment to evacuating residents. All things considered, the Debtor's Comprehensive Emergency Management Plan appears reasonable.

In fact, at trial, the Debtor called Jeffrey N. Gregg as an expert witness to opine regarding the Debtor's risk assessment in relying on evacuation as its emergency plan. For the last six years, Mr. Gregg has provided consulting services to hospices (and other healthcare providers) regarding regulatory and compliance issues.[138] Before that, Mr. Gregg worked for AHCA during the first twenty-two years

---

[135] Trial Tr. Vol. II, Doc. No. 385, p. 171, ll. 6 – 11. Ms. Saylor's testimony is consistent with a site survey that was performed before Hospice House was sold to Vitas. Debtor's Ex. 87, Doc. No. 336-5. According to the site survey, Hospice House sat 60 to 80 feet above sea level. *Id.* at § 4.3.1.

[136] Trial Tr. Vol. II, Doc. No. 385, p. 171, l. 14 – p. 172, l. 5.

[137] Trial Tr. Vol. II, Doc. No. 385, p. 171, l. 14 – p. 172, l. 5.

[138] Trial Tr. Vol. IV, Doc. No. 387, p. 80, l. 6 – p. 82, l. 10.

of the agency's existence.[139] His last role with AHCA was as AHCA's Chief of Health Facility Regulation for eleven years.[140] In that role, he oversaw the regulation of twenty-five of the thirty-five types of healthcare providers that AHCA regulated, including hospices.[141] Because many of the providers that Mr. Gregg oversaw were regulated by the federal government too, he had to be familiar with federal, as well as state, regulations.[142]

During his time with AHCA, Mr. Gregg was involved with emergency management protocols, including as one of the architects of the Comprehensive Emergency Management Plan regulations governing hospices.[143] It's hard to imagine a more qualified expert than Mr. Gregg. Given Hospice House's relatively low average daily census, coupled with the fact that it was not thriving, Mr. Gregg opined the Debtor's risk assessment in relying on evacuation was reasonable and complied with AHCA's regulations.[144]

What's more, as much as Vitas claims the plan is unworkable, the plan has, in fact, worked. Twice. When Hospice House was threatened by Hurricane Hermine in

---

[139] Trial Tr. Vol. IV, Doc. No. 387, p. 82, ll. 16 – 19.

[140] Trial Tr. Vol. IV, Doc. No. 387, p. 83, ll. 7 – 17.

[141] Trial Tr. Vol. IV, Doc. No. 387, p. 83, ll. 7 – 11.

[142] Trial Tr. Vol. IV, Doc. No. 387, p. 83, ll. 7 – 11.

[143] Trial Tr. Vol. IV, Doc. No. 387, p. 83, ll. 7 – 11.

[144] Trial Tr. Vol. IV, Doc. No. 387, p. 103, l. 13 – p. 107, l. 9.

2016, the Debtor was safely able to evacuate its patients.[145] A year later, when

Hospice House was threatened by Hurricane Irma, the Debtor relocated patients to a

skilled facility and took on four patients who were forced to evacuate from their

homes.[146] When the power went out during Hurricane Irma, the 80kW generator

powered the wall air conditioning units in the four rooms where the patients were

located, and the Debtor used the blower, as well as a few floor fans, to circulate the

cool air from the wall air conditioning units throughout the facility.[147] After a post-

storm inspection, which involved speaking with patients, families, volunteers, and

staff, AHCA indicated to the Debtor that it was pleased with Hospice House's

performance.[148]

Not only has the Debtor's plan worked, but Vitas adopted the very plan it now

complains is unworkable. For a year after the sale closed, Vitas operated with the

80kW generator as the only source of back-up power at the facility.[149] And Vitas'

Comprehensive Emergency Management Plan dated November 20, 2018—just one

---

[145] Trial Tr. Vol. IV, Doc. No. 387, p. 43, ll. 10 – p. 44, l. 15; Trial Tr. Vol. IV, Doc. No. 387, p. 48, ll. 2 – 5.

[146] Trial Tr. Vol. IV, Doc. No. 387, p. 45, l. 14 – p. 46, l. 5.

[147] Trial Tr. Vol. IV, Doc. No. 387, p. 46, ll. 6 – 16.

[148] Trial Tr. Vol. IV, Doc. No. 387, p. 47, l. 22 – p. 48, l. 1.

[149] Trial Tr. Vol. I, Doc. No. 397, p. 142, ll. 23 – 25; Trial Tr. Vol. II, Doc. No. 385, p. 122, l. 17 – p. 127, l. 6; Trial Tr. Vol. III, Doc. No. 386, p. 122, ll. 9 – 13.

month after the sale closed—does not mention a generator but does mention

evacuation of patients in the event of an emergency.[150]

That plan complied with AHCA's requirements. AHCA never cited Vitas for

the generator.[151] Nor did AHCA ever cite Vitas for its emergency preparedness

plan.[152] Vitas can hardly complain that the Debtor's plan was really no plan at all

when Vitas essentially adopted that plan for a year and was never cited for it.

## III.    Conclusion

At trial, Vitas' head of real estate and facilities testified that the company

installed the more robust 350kW generator to protect its patients' health and

safety.[153] But the issue is not whether installing the 350kW generator was a good idea

(no doubt it was). The sole issue this Court must decide is whether the Debtor was in

violation of state or federal law for not having a generator that could run its HVAC

system, in which case the Debtor would be obligated to indemnify Vitas for the

Debtor's breach of representations and warranties in the Asset Purchase Agreement.

The evidence was overwhelming at trial that the Debtor was not required to

have a generator that could run its HVAC system. To comply with state and federal

law, the Debtor was required to have an emergency preparedness plan that provided

---

[150] Trial Tr. Vol. III., Doc. No. 386, p. 94, l. 20 – p. 96, l. 2.

[151] Trial Tr. Vol. III, Doc. No. 386, p. 70, ll. 1 – 24.

[152] Trial Tr. Vol. III, Doc. No. 386, p. 70, ll. 1 – 12.

[153] Trial Tr. Vol. II, Doc. No. 385, p. 136, ll. 1 – 18.

policies and procedures for an alternate source of energy to maintain safe

temperatures at Hospice House. The Debtor had such a plan: in case of an

emergency, the Debtor would evacuate its patients to one of the other skilled nursing

facilities in the county (or Citrus Memorial Hospital). That plan was reasonable; it

worked; and it was approved by AHCA. The Debtor therefore was not in violation

of state or federal law and, as a result, need not indemnify Vitas. The Court will,

therefore, by separate order sustain the objection to Vitas' Claim No. 12-1 and grant

the Debtor's motion for turnover of the escrowed funds.

<div style="border:1px solid black;padding:10px;">

Attorney Nicolette Vilmos is directed to serve a copy of these Findings of Fact and
Conclusions of Law on interested parties who do not receive service by CM/ECF
and to file a proof of service within three days of entry of the Findings of Fact and
Conclusions of Law.

</div>

Nicolette C. Vilmos, Esq.
Frank P. Terzo, Esq.
NELSON MULLINS BROAD AND CASSEL
    *Counsel for Debtor*

Eric A. Rosen, Esq.
Ashley N. Flynn, Esq.
FOWLER WHITE BURNETT, P.A.
    *Counsel for Vitas Healthcare Corporation*